No. 35,335

Mathew Muzenich, *Appellee*, v. Grand Carniolian Slovenian Catholic Union of the United States of America, *Appellant*.

(119 P. 2d 504)

Opinion filed December 6, 1941.

*H. S. Roberts*, of Kansas City, and *Frank J. Jones*, of Joliet, Ill., for the appellant.

*Paul H. Ditzen* and *Hylton Harman*, both of Kansas City, for the appellee.

The opinion of the court was delivered by

Smith, J.: This was an action to recover the death benefits under a certificate of membership in a fraternal insurance company. Judgment was for the plaintiff. Defendant appeals.

No question was raised in the pleadings as to the certificate having been issued and being in force at the time of the death of the insured. The certificate was issued to a husband on the life of his wife on April 10, 1938. It contained the following clause:

"If the member, within two years from the date hereof, commits suicide, whether sane or insane, the liability under this certificate shall be restricted to the return of the mortuary payments actually made hereon without interest."

The certificate holder was adjudged insane in July, 1939, and was committed to the state hospital at Osawatomie, where she died on October 26, 1939. The certificate had been issued to her on April 10, 1938. Two years from the date when the certificate was

issued had not elapsed at the time of her death. There were some circumstances connected with her death which gave rise to a suspicion that she had committed suicide. The society refused payment. When this action was brought on the certificate the society defended on the ground that the insured had committed suicide and that the society was not liable except for the amount of mortuary assessments that had been paid up to that time.

The defendant had the burden of proving that the death of the deceased came within the terms of the clause that has been quoted. By the very nature of the case defendant was compelled to do this by means of circumstantial evidence. The court heard the evidence, submitted the issues to a jury and the verdict was returned in favor of the plaintiff for the face of the certificate. No special questions were asked. A motion for a new trial was overruled. The defendant has appealed.

Defendant argues first that the court erred in overruling its motion for a directed verdict at the conclusion of defendant's evidence.

Defendant made this motion on the theory that the reasonable probabilities from all the evidence all pointed to suicide as the cause of the death of deceased, so that in the light of reason and common sense the fact that she died of suicide was established with such certainty that there could be no reasonable doubt on the subject. Defendant applies and relies on the many cases where we have said that juries would not be allowed to return verdicts based on imagination and suspicion.

The evidence disclosed the following:

Deceased was assisting a nurse in the hospital; she asked permission to go to the toilet, and after she had been gone about five minutes the nurse whom she had been assisting missed her and went to look for her. When deceased was found she was lying in front of a stool in the bathroom dead; she had burns and acid marks on the left side of her face and on her shoulder; there was some fluid on the floor close to deceased's mouth. The nurse testified she detected a strong odor of carbolic acid in the room, and that when deceased had left her that morning her physical condition had been apparently good. There was also evidence that these burns were whitish, which indicated carbolic acid burns. There was evidence that the liquid on the floor near the mouth of deceased was carbolic acid. No autopsy was performed on deceased and no coroner's inquest held. A search was made for a container that might have contained car-

bolic acid and none was found, although a careful search was made in the room and in the toilet, and the sewer was taken up. There was some evidence that the vents in the toilet were unusually large. There was testimony on the part of the doctors that there was no doubt at all but that deceased died from drinking carbolic acid. There was evidence that there was some carbolic acid kept in the laboratory but that it was intact; the bottle had the same amount of carbolic acid in it that it always had and it was taped shut. There is also some evidence on the part of a doctor and two nurses that deceased was of a suicidal type; that she had been depressed and shown some improvement and was at a very dangerous point in the progress of her case as to suicidal tendencies when her death occurred.

The defendant had the burden of establishing that deceased committed suicide. (See *Mutual Life Ins. Co. v. Wiswell*, 56 Kan. 765, 44 Pac. 996.) It was compelled to rely wholly upon circumstantial evidence. Under such circumstances, where the physical facts and circumstances would justify a conclusion on one hand that the defendant took the carbolic acid into her mouth by mistake, either as to its effect or as to what it was, or on the other hand that she took it with the intention of destroying her life, we cannot say that as a matter of law one proposition or the other has been proven. It is the duty of the trier of the facts to take all of the proven and admitted circumstances and draw the inferences from them which it deems reasonable. In performing this service the trier of facts is not compelled to believe any particular testimony and this court cannot say as a matter of law that any particular circumstance was established when there was a question raised before the jury as to its being established. Thus it cannot as a matter of law be said that the substance taken into the mouth of deceased was carbolic acid nor that she drank it knowing it was carbolic acid, nor that she knew it would kill her if she did drink it. There was testimony both ways as to her being of the suicidal type, so that it cannot be said as a matter of law that she was of the suicidal type. When thus viewed it must be said that the defendant's evidence is equally consistent with the hypothesis that the death of the insured was accidental and with the hypothesis that it was suicidal, and was thus insufficient to require a directed verdict for defendant. (See *McKenzie v. New York Life Ins. Co.*, 153 Kan. 439, 112 P. 2d 86.) Where the evidence tending to prove one theory or the other is so nicely balanced it is

proper to consider the rule that the presumption is against suicide. (See *Mutual Life Ins. Co. v. Wiswell*, supra.)

The second argument of the defendant is that the court erred in giving a certain instruction to the jury. This is instruction No. 7 and is as follows:

"The distinction between suicide by a sane person and suicide by an insane person, within the meaning of that provision of the benefit certificate precluding recovery in the event the member commit suicide, whether sane or insane, lies in the mental capabilities in the one case and the absence of them in the other to appreciate the moral nature and equality of the purpose. In other words, it is essential to constitute suicide, even of an insane person, that he must be conscious of his act and have in his mind an idea of self-destruction. And in this case, before you can find that the deceased, Karolina Muzenich, committed suicide, you must find from a preponderance of the evidence that her act, if any, was accompanied by a consciousness of its nature and that she had in mind an idea of self-destruction. You are instructed that the mere fact that Karolina Muzenich was insane does not in itself prove an inability on her part to be conscious of the physical nature and consequences of suicide, as an intention to kill one's self might coexist with an unsound condition of the mind."

Defendant argues that the giving of this instruction was error, since it put upon the defendant the burden of proving that deceased was conscious of the fact that the act she committed would cause her death.

Defendant cites and relies on authorities from several states holding that where provisions of like import to the one we are considering were in the policy sued on an instruction such as this was improper.

This court considered the question in *Power v. Modern Brotherhood*, 98 Kan. 487, 158 Pac. 870. That was a suit on a beneficiary certificate that contained a clause similar to the one we are considering. There was no question in the case but what the insured died on account of a bullet fired into his head by himself with the declared intention of killing himself. We do not have such a fact situation here. The evidence tending to establish the intention on the part of the insured is lacking. This court held that an instruction somewhat like the one given in this case was improper because the facts did not warrant it. What we are interested in is that this court said:

"As suggested, the reasoning of the Wisconsin court appears sound. For it would seem that there must be some distinction made in those cases where death occurs as the result of an accident. Fatal accidents often occur to persons who are insane, accidents which would not have happened had the injured person been sane. It would seem that the reasonable construction of the phrase, 'suicide, sane or insane,' should include every case in which the insured kills

himself by a voluntary act, the nature and ordinary tendency of which is to produce death, that is, every case of intentional self-destruction; and should not include cases of unintentional or accidental death, although the accident is brought about by the careless or negligent act of the deceased."

The Wisconsin case to which this court referred in the foregoing quotation is *Cady v. Fidelity & C. Co.*, 134 Wis. 322, 113 N. W. 967, 17 L. R. A., n. s., 260. In that case the insured had thrown himself down a shaft in a building. The policy sued on had a clause such as we are considering. The trial court gave an instruction such as we have here. There was a verdict and judgment for the plaintiff. On appeal the question we are considering was raised. The court stated that the question was ruled by *Pierce v. The Travelers' Life Insurance Company*, 34 Wis. 389, and said:

"The effect of the decision above referred to is that, if one takes poison by mistake, or steps into an elevator shaft, not having in mind for the time being its existence, or falls from a window or any place involving danger while walking in his sleep or flying from imaginary danger, he not having any mental purpose of self-destruction; and death ensues, such result is accidental. The court said, in effect, that death resulting from an act committed under the influence of delirium, as by one who, in a paroxysm of fear, precipitates himself from a window, or, having been bled, removes the bandage, or takes poison by mistake, and death ensues, never received nor deserved the name 'suicide' and is not within the meaning of the language, 'death by suicide, felonious or otherwise, sane or insane.' Such language does not include an act of self-destruction resulting in death, whether intentional or not, unaccompanied by a purpose to effect death, with the absence of all design to take life. It was enough that it was 'the voluntary and willful act of a man having at the time sufficient powers of mind and reason to understand the physical nature and consequences of such an act, and having at the time a purpose and intention to cause his own death by that act; and that the question whether, at the time, he was capable of understanding and appreciating the moral nature and quality of his purpose, is not relevant to the inquiry, further than as it might help to illustrate the extent of his capacity to understand the physical character of the act itself." (pp. 330, 331.)

This court discussed the situation in *Hart v. Modern Woodmen*, 60 Kan. 678, 57 Pac. 936. In that case the court held that a clause such as we are discussing here was valid, but in doing so used the following language:

"The agreed facts show a case of intentional self-destruction, and that, while he did not understand the moral character of his acts, he had sufficient intelligence as to what the physical end and consequences of the same would be. We are not required to determine the effect of such an exception where the insured was so wholly bereft of reason that he did not understand the natural result of his acts." (p. 683.)

It should be noted here that the court placed that decision on the fact that the deceased intended to destroy himself; that even though he did not understand the moral character of his acts he understood what the physical consequences would be. The court quoted *Bigelow v. Berkshire Life Ins. Co.*, 93 U. S. 284, 23 L. Ed. 918, as follows:

" 'Nothing can be clearer than the words, "sane or insane," were introduced for the purpose of excepting from the operation of the policy any intended self-destruction, whether the insured was of sound mind or in a state of insanity. These words have a precise, definite, well-understood meaning. No one could be misled by them; nor could an expansion of this language more clearly express the intention of the parties. In the popular, as well as the legal sense, suicide means, as we have seen, the death of a party by his own voluntary act; and this condition, based, as it is, on the construction of this language, informed the holder of the policy that if he purposely destroyed his own life, the company would be relieved from liability.' " (p. 682.)

It is thus clear that these cases turned upon the question of whether the deceased understood what the natural and physical consequences of the act would be whether it was taking poison, carrying a pistol or jumping down a shaft.

To the same effect is *Masonic Life Ass'n of Western N. Y. v. Pollard's Guardian*, 121 Ky. 349, 89 S. W. 219. There the court said:

"On the contrary, the law is that, if the insured intentionally took his own life, at a time when his mind was so far gone as to render him unconscious that he was taking his life, the act will not be deemed his, but will be regarded in law as an accidental killing." (p. 354.)

See, also, *Metropolitan Life Ins. Co. v. Thomas*, 32 Ky. L. 770, 106 S. W. 1175; also, *National Life Ins. Co. v. Watson*, 194 Ky. 355, 239 S. W. 35; also, *New York Life Ins. Co. v. Dean*, 226 Ky. 597, 11 S. W. 2d 417.

The last holding of the supreme court of Wisconsin on the subject is *Ladwig v. National Guardian Life Ins. Co.*, 211 Wis. 56, 247 N. W. 312.

See, also, 29 Am. Jur. 701, note 16.

This construction is in accord with the generally accepted meaning of the word "suicide." In Webster's New International Dictionary, 2d ed., 1935, the following definition is given:

"Act or an instance of taking one's own life voluntarily and intentionally; Law, self-murder; deliberate and intentional destruction of his own life by a person of years of discretion and of sound mind."

In *Nimick v. Insurance Co.*, 10 Am. Law Reg. (N. S.) 101, "suicide" is defined as follows:

"Suicide is the willful and voluntary act of a person who understands its nature, and intends by it to accomplish the result of self-destruction."

See, also, *John Hancock Mutual Life Insurance Co. v. Moore*, 34 Mich. 41; *Knights Templars' Indemnity Co. v. Jarman*, 187 U. S. 197, 23 Sup. Ct. 108, 47 L. Ed. 139.

In Black's Law Dictionary "suicide" is defined as follows:

"The deliberate termination of one's existence, while in the possession and enjoyment of his mental faculties."

The rule is to the effect that where the evidence is nicely balanced as to whether or not the deceased committed suicide the presumption is that the death was not the result of suicide, as has been referred to heretofore. It is also stated in *Mutual Life v. Wiswell*, supra.

It should be remembered that the question of whether or not the deceased committed suicide turns upon whether she appreciated the physical consequences of the act which caused her death. Were this not the rule it would be impossible to tell whether death in a particular case was the result of accident or suicide. We have concluded that instruction No. 7 was a proper instruction to be given under the circumstances of the case.

There is a further reason why this judgment should not be reversed on account of this instruction. Counsel for the defendant tried his case on the theory of the instruction. When the defendant was putting on its evidence one of its witnesses was asked concerning statements the deceased had made concerning suicide. The plaintiff objected to the statement because it would be the statement of an insane person. After a colloquy between the trial court and counsel for both sides the court said:

"I think that, as I stated before, in this kind of a case we must give a lot of latitude in the testimony on both sides so that the jury can determine the very difficult question whether or not she took the poison and whether or not she had a desire to commit suicide; and I think for that reason the question is proper."

Whereupon counsel for defendant stated—

"That is the universal rule by a number of authorities. . . . I can give you some authorities if you want me to look them up."

The trial court overruled this objection, whereupon several witnesses testified to statements made by deceased, and as to suicidal tendencies of deceased generally. Early in the trial counsel adopted the theory of instruction No. 7 as the correct theory of the case.

Defendant next argues that the court erred in giving instructions 8 and 9.

What has been said with reference to instruction No., 7 applies with equal force to these two instructions, and we find no error in them.

The next argument is that by instruction No. 5 the court told the jury that the plaintiff had performed all the conditions of defendant's bylaws. This instruction was intended, no doubt, to advise the jury that the proper proof of death had been made and deceased was in good standing with the society at the time of her death. It does not appear to have prejudiced defendant.

The defendant next argues that the court erred in refusing to instruct the jury that the defendant in this case was a fraternal organization rather than an insurance company. We are unable to see why this instruction was required in a case such as this, where the only real point in issue was whether this clause should apply under all the circumstances.

The defendant next argues that the court erred in refusing to instruct the jury that the coroner of Kansas is only required by law to hold inquests upon the dead bodies of persons who are supposed to have died by unlawful means or where the cause of their death is unknown. The coroner did not testify in this case and defendant argues that plaintiff made a great deal of this point. It is doubtful whether that instruction should have been given under the circumstances of this case. Apparently the cause of the death of the deceased in this case was unknown and it would appear that the coroner should have held an inquest. Furthermore, it does not appear that the defendant was prejudiced in its defense by the failure of the court to give this instruction.

The next argument of the defendant is that the court erred in refusing to admit the proofs of death made by the plaintiff as a part of the plaintiff's proof and limited their admissibility when the defense introduced them. It appears in this record that when the proofs of death were offered by the plaintiff the court refused to admit them upon its own motion. They did state that the deceased died from suicide. At any rate, these proofs of death were admitted in evidence during the trial. The jury was allowed to examine them. We do not find where the defendant was prejudiced on account of their being admitted when they were.

In the next argument the defendant points out that the plaintiff

was permitted to introduce a small bottle filled with carbolic acid, a bottle filled with Lysol and one filled with water. The jury was permitted to smell each one of these. Defendant argues that this was error. There had been some evidence about Lysol introduced and also some evidence about the distinctive odor of carbolic acid. It appears that the introduction of this evidence would do the defendant as much good as it would do the plaintiff, and we see no error in it.

The judgment of the trial court is affirmed.

THIELE, J. (dissenting): I cannot agree that the present appeal should be affirmed. A due regard for other duties and a recognition that only a minority view is expressed impels me to be brief.

The record clearly discloses that the insured died as the result of taking poison internally. On the first question whether the taking was suicidal or accidental it is stated in the opinion that there were some circumstances which gave rise to a suspicion the insured had committed suicide, but in detailing the evidence no mention is made of testimony of two nurses at the hospital that in their hearing the insured had threatened to take her own life, and that insured's husband had written to the superintendent of the hospital "yesterday I visited my wife and while there she threatened to take her own life within this week if I failed to remove her from your sanitarium. She said she had her plans already made."

The statement of facts and a search of the record as abstracted discloses no evidence that, in my opinion, leads to any conclusion the insured took the poison accidentally; the converse seems to be indicated.

But passing that question, the cause was submitted to the jury under an instruction set out in the opinion which permitted the jury to consider whether the insured appreciated the moral nature and quality of her act, and that she acted consciously and deliberately.

The provision of the contract was that if the insured committed suicide, sane or insane, liability should be limited as provided. The instruction as given might have been proper if the words "sane or insane" had been absent from the policy, but as given, it made them substantially meaningless. Decisions from a few states may be found that inclusion of the words "sane or insane" in such an insurance contract provision does not dispense with the necessity of the company's showing the insured was able to understand and appre-

ciate the physical nature and consequences of the action causing his death, but the majority view is to the contrary. See 35 A. L. R. 165, 167, and many cases cited. In my opinion the majority view should be followed, for otherwise insertion of the words "sane or insane" is a futility. As a general rule contracts are to be construed to give the words and phrases used their ordinary meaning, and force and effect are to be given to the entire paragraph, sentence, clause or phrase under consideration. In my opinion that was not done in the instruction complained of, and it is erroneous.

ALLEN, J., joins in this dissent.